UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MATTHEW EMSAK,

                    Plaintiff,

             v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

-----------------------------------------------------------------x

**MEMORANDUM & ORDER**
13−CV−3030

PAMELA K. CHEN, United States District Judge:

      Plaintiff Matthew Emsak ("Plaintiff") brings this action, seeking review of a final decision by the Acting Commissioner ("Commissioner")[1] of the Social Security Administration ("SSA") denying Plaintiff's claim for disability insurance benefits and Supplemental Social Security Income ("SSI") from April 2010 to May 2013. The parties now cross-move for judgment on the pleadings. Plaintiff seeks reversal of the Commissioner's decision and immediate award of benefits, or remand for further administrative proceedings. The Commissioner seeks affirmation of the denial of Plaintiff's claim.

      For the reasons set forth below, the Court remands Plaintiff's claim to the Commissioner for further proceedings consistent with this opinion.

---

[1] The action was originally brought against Michael J. Astrue in his capacity as Commissioner of Social Security. Carolyn W. Colvin is automatically substituted as a party to this action because she succeeded Mr. Astrue as Acting Commissioner. *See* Fed. R. Civ. P. 25(d).

## I.    BACKGROUND

### A.    Plaintiff's Application

Plaintiff applied for disability insurance benefits and SSI on June 26, 2010, alleging that he has been disabled since April 15, 2010,[2] the date on which Plaintiff attempted to jump in front of a subway train and was hospitalized for suicidal behavior.  (Tr. 152-62, 208.)  In his application, Plaintiff claimed that he was suffering from obsessive compulsive disorder, suicidal behavior, anxiety, depression, and severe paranoia.  (Tr. 174.)

The SSA initially denied Plaintiff's claim on October 6, 2010.  (Tr. 84.)  Plaintiff then requested a hearing before an administrative law judge.  (Tr. 10.)  Administrative Law Judge ("ALJ") Hilton R. Miller held a hearing on November 2, 2011, where he heard testimony from Plaintiff, his father, and an impartial vocational expert ("VE").  (Tr. 10.)

### B.    Personal History and Past Employment

Plaintiff was born in 1988.  (Tr. 152.)  At the time Plaintiff applied for benefits, he was a full-time college student who had engaged in some part-time employment.  (Tr. 47, 54-56.) Plaintiff had completed three years of college and anticipated graduating in 2012 or 2013.  (Tr. 15, 47.)  Plaintiff's highest educational level was third year of college (College of Staten Island). (Tr. 47, 324.)  Plaintiff attended Stony Brook University and transferred to the College of Staten Island in 2011 (Tr. 61, 324.)  Aside from the one year on campus, he lived with his parents and siblings.  (Tr. 61.)

At college, Plaintiff received accommodations consisting of extended time on exams, alternate testing locations, and occasional open book tests.  (Tr. 61-63.)  Plaintiff majored in

---

[2] The ALJ's decision identifies claimant's application date as June 11, 2010, but the record shows that he made the application on June 26, 2010.  (*See* Transcript of the Administrative Hearing ("Tr."), Dkt. 8, at 10, 152.)

biology and received average grades. (Tr. 42, 59.) Prior to attending college, he had not been placed in special education. (Tr. 41-42.)

Plaintiff has held a variety of part-time positions since the age of 16. (Tr. 54-55, 168.) He self-reported that between 2004 and 2006, he worked as a dental assistant, three days per week, for ten hours per day. (Tr. 175.) He cleaned the tools, greeted patients and prepared them for examinations. (Tr. 54, 182.) Between 2008 and 2009, while at Stony Brook, Plaintiff worked as a fry cook at school one day a week for four hours. (Tr. 54.) Between 2006 and March 2010, Plaintiff worked for the NYC Board of Education as a substitute paraprofessional three days per week, for seven hours per day, and was paid $129 a week. (Tr. 51-52, 174.) When he was called in, he worked with special education students from grades six through twelve, for the full school day. (Tr. 49-50.) Plaintiff assisted the teacher, helped students with their coursework, and ensured that students remained in class. (Tr. 50-51.) On his SSA benefits application, Plaintiff listed March 30, 2010 as his last day of employment (Tr. 174), but during his hearing before the ALJ, he testified to having worked as a substitute paraprofessional in June or July 2011 for a few days. (Tr. 50.)

At the hearing on November 2, 2011, Plaintiff testified that he heard his own voice. (Tr. 35.) The voice told Plaintiff that he should jump in front of a car. (Tr. 36.) He abused energy drinks. (Tr. 35.) He was depressed because girls refused to get into relationships with him. *Id.* He had a lot of paranoid thoughts, such as people following him via the Internet. (Tr. 40.) Plaintiff stated that he played video games a lot but had no other hobbies. (Tr. 47.) He did not engage in social activities and had no friends. (Tr. 58.) During the hearing, Plaintiff's father testified that Plaintiff started talking to himself two years ago. (Tr. 43.)

## C. Medical History and Treating Professionals' and Consulting Physicians' Assessments

### 1. Suicide Attempt and Initial Hospitalization

On April 15, 2010, Plaintiff attempted suicide by jumping off a subway platform. (Tr. 208, 221.) He returned to the platform, however, and a police officer brought him to the psychiatric emergency room of Jamaica Hospital Medical Center. (Tr. 208, 221.) Because Plaintiff had also allegedly overdosed on Hydrocodone, the hospital transferred him to the medical emergency room. (Tr. 199, 208-209.) Upon becoming medically stable, Plaintiff returned to the psychiatric emergency room. (Tr. 199, 208-209.) He remained there for four days. (Tr. 205-06.)

On April 19, 2010, Plaintiff was transferred to Richmond University Medical Center (RUMC). (Tr. 198, 206.) His admitting diagnosis was paranoid schizophrenia. (Tr. 198.)

### 2. Treatment at Staten Island University Hospital

On May 11, 2010, Plaintiff began an outpatient program at Staten Island University Hospital. (Tr. 217-36.) According to his integrated admission assessment, Plaintiff reported that he was taking Lexapro, Zyprexa and Ativan,[3] was less anxious, and had been sleeping well. (Tr. 219, 221.) He denied having any appetite disturbance, problems with concentration, suicidal/homicidal ideation, or hallucinations. (Tr. 221.) Plaintiff stated that he had previously

---

[3] Lexapro is an antidepressant medicine that may increase suicidal thoughts or actions. *See 17.2 FDA—Approved Medication Guide*, FDA (last visited on July 30, 2015), http://www.fda.gov/downloads/Drugs/DrugSafety/ucm088620.pdf. Zyprex is a prescription medicine used to treat schizophrenia in people age 13 or order, bipolar disorder, episodes of depression that happen with bipolar I disorder and episodes of depression that do not get better after 2 other medicines. *See Medication Guide—Zyprexa*, FDA (last visited on July 30, 2015), http://www.fda.gov/downloads/Drugs/DrugSafety/UCM134700.pdf. Ativan is an antianxiety agent. *See Ativan*, FDA (last visited on July 30, 2015), http://www.accessdata.fda.gov/drugsatfda_docs/label/2007/017794s034s035lbl.pdf.

reported hearing voices so that he would be hospitalized.  (Tr. 221.)  He said that he was not returning to work in order to minimize stress.  (Tr. 224.)

Plaintiff's psychiatric evaluation at Staten Island University Hospital described his social functioning as cooperative and verbal, and noted that his appearance, motor activity, affect, speech, thought process, thought content, and abstraction were all appropriate.  (Tr. 223, 226.)  It noted Plaintiff's mood as depressed.  (Tr. 226.)  It listed Plaintiff's Axis I diagnoses as psychotic disorder not otherwise specified ("NOS"), and depressive disorder NOS.[4]  (Tr. 228.)  It scored Plaintiff's Global Assessment of Functioning ("GAF") as 45, and noted Plaintiff's highest GAF score during the past year was 60.[5]  (Tr. 234.)  Upon his admission to the outpatient program, Plaintiff was treated with medication and psychotherapy.  (Tr. 234-35.)  He attended the program regularly and participated in groups.  (Tr. 237.)

Plaintiff was discharged from Staten Island University Hospital on June 9, 2010.  (Tr. 237.)  The discharge summary stated that Plaintiff denied any active symptoms.  (Tr. 237.)  He reported less paranoia and depression, and he denied suicidal ideation.  (Tr. 237.)  Plaintiff stated that he planned to return to school for the Fall 2010 semester.  (Tr. 237.)  Upon discharge, his Axis I diagnoses remained psychosis disorder NOS and depressive disorder NOS.  (Tr. 237.)

---

[4] In the multi-axial evaluation, Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V rates the patient's GAF.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th edition-text revision 2000) ("DSM-IV-TR") at 27-34.

[5] A GAF of between 41 and 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning.  *See* DSM-IV-TR at 34. A GAF of between 51 and 60 indicates moderate symptoms (*e.g.*, flat effect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *Id.*

Plaintiff continued to take Celexa, Zyprexa, and Ativan. (*Id.*) He was referred for outpatient treatment at Staten Island University Hospital. (*Id.*)

> ### 3.  Subsequent Treatment and Assessments by Medical Professionals

Between June 2010 and November 2011, the following medical professionals rendered opinions about Plaintiff's condition: Marina Troyanovsky, L.C.S.W.; Nancy Carr, N.P.; A. Genzer, L.C.S.W.; P. Phillips, N.P., Herb Meadow, M.D.; and Dr. Hou, M.D. Their opinions and impressions of Plaintiff are recounted below.

> #### a.  *Marina Troyanovsky, L.C.S.W.*[6]

On June 15, 2010, Ms. Troyanovsky assessed Plaintiff's condition upon his admission to outpatient treatment at Staten Island University Hospital. Plaintiff denied being depressed or anxious or experiencing any current suicidal ideation. (Tr. 242.) He also denied drinking or currently having paranoid thoughts, but admitted to having "unwanted thoughts" before his hospitalization. (Tr. 242.)

> #### b.  *Nancy Carr, N.P.*[7]

Ms. Carr saw Plaintiff numerous times between June 2010 and August 2011. Ms. Carr conducted an initial psychiatric evaluation of Plaintiff on June 22, 2010. (Tr. 247-49.) She judged his appearance, motor activity, affect, thought process and content, and speech to all be appropriate. (Tr. 247.) She noted that his mood was neutral and that his judgment and insight were mildly impaired. (Tr. 247.) He had no current suicidal or homicidal ideation, plan, or intent. (Tr. 248.) Ms. Carr diagnosed Plaintiff as having depressive disorder, NOS and

---

[6] "L.C.S.W." refers to a licensed clinical social worker. *See* www.op.nysed.gov/prof/sw/lcsw.htm (last visited on July 28, 2015).

[7] "N.P." refers to nurse practitioner. *See* www.op.nysed.gov/prof/nurse/np.htm (last visited on July 28, 2015).

psychotic disorder, NOS; she ruled out major depressive disorder with psychotic features and alcohol abuse. (Tr. 249.) Ms. Carr rated Plaintiff's GAF as 50. (Tr. 249, 255.)

When seen by Ms. Carr on July 15, 2010, Plaintiff made positive eye contact. (Tr. 260.) His hygiene was good, and he denied sleep or appetite problems. (Tr. 260.) His other evaluation indices remained the same as those of the June evaluation. (Tr. 260.)

On August 17, 2010, Ms. Carr expressed her concern with Plaintiff leaving home this early in his recovery period to return to school. (Tr. 274.) During this session, Plaintiff denied paranoia, hallucinations, or suicidal/homicidal ideation, intent, or plan. (*Id.*)

On February 11, 2011, Plaintiff saw Ms. Carr again for a renewal of prescriptions. (Tr. 328.) He was depressed and reported some non-compliance with medication. (Tr. 328.) Plaintiff admitted to having some suicidal ideation over the prior two months, with no plan or intent. (Tr. 328.) He had no hallucinations. (Tr. 328.) Plaintiff experienced increased depression and anxiety while away at school and reported feeling anxious prior to the start of his then-current college semester. (Tr. 328.) Ms. Carr found the other aspects of Plaintiff's examination, *e.g.*, appearance, the same as during the June 22, 2010 examination. (Tr. 326, 247.) Ms. Carr diagnosed Plaintiff with schizophrenia (paranoid type), and depressive disorder, NOS. (Tr. 334.) She rated Plaintiff's GAF as 55. (Tr. 334.) Ms. Carr prescribed Celexa and Zyprexa. (Tr. 307-08.)

When seen by Ms. Carr for medication management on March 10, 2011, Plaintiff denied mood liability, depression, or hallucinations. (Tr. 309.) Plaintiff's mood was neutral and moderately constricted. (Tr. 309.) He had no overt psychoses. (Tr. 309.) Plaintiff reported that since his last session he had a passing suicidal thought but stated that he had no intent. (Tr. 309.) Plaintiff denied depressive symptoms, mood lability, or sleep disturbance. (Tr. 309.) He denied

suicidal/homicidal ideations, intent, or plan.  (Tr. 309.)  He did not socialize with friends.  (Tr. 309.)

On April 7, 2011, Ms. Carr noted that plaintiff was mildly malodorous.  (Tr. 310.)  The other aspects of Plaintiff's examination, *e.g.*, appearance, remained the same as during both the June 22, 2010 and the February 11, 2011 examinations.  Ms. Carr diagnosed schizoaffective disorder[8] and depression, and prescribed Celexa and Zyprexa. (Tr. 308, 10.)

On April 14, 2011, Ms. Carr received a telephone call from the director of disability services at Plaintiff's school expressing concern about Plaintiff's behavior and potential for violence.  (Tr. 310.)  During the meeting with Plaintiff regarding the director's complaints, Ms. Carr noted that Plaintiff had no history of violence and Plaintiff denied any plan to harm anyone. (Tr. 310.)  No overt psychoses were detected, and Plaintiff denied hallucinations or paranoia. (Tr. 310.)

When seen for medication management by Ms. Carr on May, 2011, Plaintiff presented with spontaneous speech.  (Tr. 312.)  His hygiene and eye contact had improved.  (Tr. 312.) Plaintiff denied depressive symptoms or mood lability.  (Tr. 312.)  He reported that his sleep and appetite were good.  (Tr. 312.)  No overt psychosis, scanning, or internal preoccupations were evident. Plaintiff denied suicidal/homicidal ideation, intent, or plan.  (Tr. 312.)  Ms. Carr diagnosed schizoaffective disorder and depression and prescribed Celexa and Zyprexa.  (Tr. 308, 312.) During meetings on June 16, July 15, and August 22, 2011, Ms. Carr made the same diagnoses.  (Tr. 313.)

---

[8] Schizoaffective disorder is a mental condition that causes both a loss of contact with reality (psychosis) and mood problems (depression or mania).  *See Schizoaffective disorder*, U.S. National Library of Medicine (last visited on July 39, 2015), http://www.nlm.nih.gov/medlineplus/ency/article/000930.htm.

c. *A. Genzer, L.C.S.W.*

Plaintiff returned to Staten Island University Hospital on January 24, 2011 for outpatient treatment, and a licensed clinical social worker, A. Genzer[9], conducted an integrated admission assessment. (Tr. 315-26, 329-33.) Plaintiff continued to take Zyprexa and Celexa, and stated that he was "doing okay" on his medications. (Tr. 319, 321.) He had transferred from Stony Brook back to the College of Staten Island, and liked it there. (Tr. 321.) He admitted to past hallucinations, but denied any current hallucinations. (Tr. 321.) Plaintiff spent his free time playing video games and studying. (Tr. 323.)

d. *P. Phillips, L.C.S.W.*

Plaintiff was seen by P. Phillips[10], L.C.S.W. on July 21, 2010 for individual therapy and a substance abuse assessment. (Tr. 271.) Plaintiff stated that he was responding to hallucinations and was paranoid that his boss and others were against him. (Tr. 271.) He believed that by "leaning against the train he would be placed in a psychiatric hospital and would not be fired."[11] (Tr. 271.) Plaintiff denied active suicidal and homicidal ideation, intent, or plan. (Tr. 271.)

On July 29, 2010, Ms. Phillips reviewed Plaintiff's initial medication plan, and developed wellness goals and a crisis contingency management plan for Plaintiff. (Tr. 271, 272.) Plaintiff was compliant with medication. (Tr. 272.) He denied active suicidal/homicidal ideation, intent, or plan. (Tr. 272.)

On September 3, 2010, Plaintiff returned to Ms. Phillips for individual therapy. (Tr. 272.) Plaintiff reported that his mood was stable and denied suicidal/homicidal ideation, intent,

---

[9] A. Genzer's first name does not appear in Plaintiff's medical records.

[10] P. Phillips's first name does not appear in Plaintiff's medical records. However, based on references in the government's brief, it appears that P. Phillips is female.

[11] Ms. Phillips's notation, which might be quoting or paraphrasing Plaintiff, is cryptic.

or plan. (Tr. 272.) He denied alcohol or substance use. (Tr. 272.) Plaintiff minimized his history of black-outs. (Tr. 272.)

### e. *Questionnaires by Ms. Carr and Ms. Phillips*

Ms. Carr and Ms. Phillips completed three different mental health questionnaires for Plaintiff on November 4, 2011[12]; these were also signed by a medical doctor[13] (Tr. 339-45.) In a "mental residual function capacity form," Ms. Carr and Ms. Phillips rated Plaintiff's ability to relate to other people, his restriction of daily activities, deterioration of personal habits, and constriction of interests as moderately severe. (Tr. 339.) Plaintiff showed moderate impairment in his abilities to understand, carry out, and remember instructions and perform simple tasks. (Tr. 339-40.) Plaintiff had moderately severe restrictions with regard to responding appropriately to supervision, performing complex tasks, and performing repetitive tasks. (Tr. 339-40.) They opined that Plaintiff had severe limitations in responding appropriately to co-workers, responding to customary work pressures, and performing varied tasks. (Tr. 339-40.) Ms. Carr and Ms. Phillips commented that Plaintiff had severe and persistent mental illness and the earliest applicable date was April 19, 2010. (Tr. 340.)

The second questionnaire completed is "12.03[14] questionnaire—schizophrenia." (Tr. 341-42.) In this questionnaire, Ms. Carr and Ms. Phillips indicated that Plaintiff had delusions or hallucinations, inappropriate affect, and emotional withdrawal and/or isolation. (Tr. 341.) With respect to 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(B) ("§ 12.03(B)"), Plaintiff had: (1)

---

[12] Although the date of the questionnaires is two days after the hearing before the ALJ, the Court infers from the inclusion of the questionnaires in the administrative record that the ALJ was aware of, and considered, them prior to issuing his decision.

[13] The doctor's name is not discernible from his signature in the record.

[14] "12.03" refers to 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(A) ("§ 12.03(A)").

marked restrictions of activities of daily living; (2) marked difficulty in maintaining social functioning; (3) deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; (4) and had repeated episodes of deterioration or decompensation. (Tr. 340-41.) With respect to 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(C), they indicated that Plaintiff had repeated episodes of deterioration or decompensation in situations which caused him to withdraw from that situation or to experience signs or symptoms. (Tr. 341.)

Ms. Carr and Ms. Phillips also completed a "depression questionnaire." (Tr. 343-45.) In this questionnaire, Ms. Carr and Ms. Phillips opined that plaintiff suffered from: (1) anhedonia[15]; (2) appetite disturbance with change in weight; (3) psychomotor agitation or retardation; (4) difficulty concentrating or thinking; and (5) hallucinations, delusions, or paranoid thinking. (Tr. 343-44.) They also opined that Plaintiff had: (1) marked restrictions of activities of daily living; (2) marked difficulty in maintaining social functioning; (3) deficiencies of concentration, persistence, or pace, resulting in frequent failure to complete tasks in a timely manner, and (4) repeated episodes of deterioration or decompensation. (Tr. 344.) Finally, Ms. Carr and Ms. Phillips indicated that Plaintiff had: (1) a medically documented history of (i) a chronic affective disorder of at least two years' duration that caused more than a minimal limitation of his ability to do basic work activities with repeated episodes of decompensation, and (ii) a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation; and (2) a

---

[15] Anhedonia refers to the reduced ability to experience pleasure and is considered as a core feature of major depressive disorder. *See Neurobiological Mechanisms of Anhedonia*, U.S. National Library of Medicine (last visited on July 30, 2015), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181880/.

current history of one or more years' inability to function outside a highly supportive living arrangement. (Tr. 344-45.)

f.  *Herb Meadow, M.D.*

Herb Meadow, M.D., conducted a consultative psychiatric evaluation of Plaintiff on August 13, 2010.  (Tr. 262-65.)  Plaintiff, who lived with his parents at the time, traveled to the evaluation by public transportation with his father.  (Tr. 262.)  Plaintiff stated that he could travel on his own.  (Tr. 262.)  Plaintiff reported to have "an increased appetite, and had gained 30 pounds over the past years."  (Tr. 262.)  Plaintiff denied currently being depressed.  (Tr. 262.)  Plaintiff stated that he became anxious at times, and had panic attacks, described as sweating accompanied by breathing difficulties, brought on by stress and without agoraphobia.  (Tr. 262.)  He denied manic symptoms.  (Tr. 262.)  Plaintiff reported a history of intrusive thoughts without hallucinatory experiences.  (Tr. 262.)  He had previously experienced paranoid ideation with some delusional thinking, which he stated had stopped, for the most part, with medication.  (Tr. 262-63.)

Upon examination, Plaintiff appeared well groomed.  (Tr. 263.)  His gait, posture, and motor behavior were normal.  (Tr. 263.)  Plaintiff's eye contact was appropriate.  (Tr. 263.)  Plaintiff's speech, language, attention, and concentration were normal and appropriate.  (Tr. 263.)  Plaintiff's cognitive functioning was average with a general fund of information appropriate to experience.  (Tr. 264.)  His insight and judgment were fair.  (Tr. 264.)

Dr. Meadow diagnosed panic disorder without agoraphobia, and schizoaffective disorder, on Axis I.  (Tr. 264.)  He opined that Plaintiff would be able to perform all tasks necessary for vocational functioning.  (Tr. 264.)  Dr. Meadow added, however, that given Plaintiff's recent

hospitalization for psychiatric illness, he should have several months outside of the hospital in a stabilized condition before attempting to reenter the workforce. (Tr. 264.)

g. *Dr. S. Hou, M.D.*[16]

Dr. S. Hou, a State agency psychiatric consultant, reviewed the medical evidence of record and completed a psychiatric review technique form on October 4, 2010. (Tr. 281-94.) He concluded that Plaintiff's impairments did not meet the criteria of § 12.03 (Schizophrenic, Paranoid and other Psychotic Disorders) or § 12.06 (Anxiety-Related Disorders). (Tr. 281, 283, 286.) Dr. Hou also assessed Plaintiff's mental residual functional capacity. (Tr. 295-97.) Dr. Hou opined that Plaintiff was not significantly limited in any aspects of understanding and memory. (Tr. 295.) Dr. Hou determined that Plaintiff had the mental residual functional capacity to understand, remember, and carry out tasks and relate appropriately to co-workers and supervisors in a routine work setting. (Tr. 297.)

**D.  Vocational Expert Testimony**

At the hearing before ALJ Miller on November 2, 2011, Peter A. Manzi, a vocational expert, testified that according to the U.S. Department of Labor, *Dictionary of Occupational Titles* (DOT), Plaintiff's work as a: (1) teacher's aide (DOT No. 249.367-074) was light and semi-skilled; (2) dental assistant (DOT No. 079.361-018) was light and skilled; and (3) short order cook (DOT No. 313.374-014) was light and semi-skilled. (Tr. 69.)

ALJ Miller posed a hypothetical of an individual of Plaintiff's age, education, work experience, with the residual functional capacity to perform work at all exertional levels that does not involve heights or machinery and is limited to work that is simple, routine and repetitive in a static environment. (Tr. 70.) Mr. Manzi responded that the individual could not perform any of Plaintiff's past jobs. (Tr. 70.) Adding to this hypothetical the additional factor that the

---

[16] Dr. Hou's first name does not appear in Plaintiff's medical records.

job require only brief and superficial contact with the public, Mr. Manzi testified that the individual could perform the following representative unskilled jobs: hand packager (DOT No. 920.587-018), with 164,818 positions existing nationally and 3,400 locally; furniture cleaner (DOT No. 709.687-014), with 94,992 positions existing nationally and 1,500 locally; and industrial cleaner (DOT No. 381.687-018), with 1,070,000 positions nationally and 35,000 locally. (Tr. 70-71.)

###    E.    The ALJ's Decision

By decision dated November 18, 2011, ALJ Miller denied Plaintiff's claim. (Tr. 7-22.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 12, 2013. (Tr. 1-6.)

The ALJ found that Plaintiff had the severe impairments of panic disorder with agoraphobia, and schizoaffective disorder, but that these impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-13.) The ALJ also concluded that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but with the non-exertional limitations that: (1) he could only perform work involving simple, routine, repetitive tasks in a static environment, and requiring only brief and superficial contact with a the public; and (2) the work could not involve heights or machinery. (Tr. 14.) In reaching these conclusions, the ALJ relied on the opinions of the two consulting psychiatrists, Drs. Meadow and Hou. (Tr. 16.) The ALJ gave little weight to the opinions of Ms. Carr, the nurse practitioner who treated Plaintiff, because, according to the ALJ, Ms. Carr had not adequately taken into account the claimant's level of functioning despite the impairments. (Tr. 16.) The ALJ did not discuss the opinions of Ms. Phillips, the licensed clinical social worker who treated Plaintiff. The ALJ also did not find Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms

14

credible "to the extent they [were] inconsistent with [Plaintiff's] residual functional capacity assessment." (Tr. 15.) The ALJ concluded that Plaintiff was unable to perform any past relevant work, but that based on the VE's testimony, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform given Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 16-17.)

## II.    STANDARD OF REVIEW

### A.    The Substantial Evidence Standard for District Court Review of the Commissioner's Decision

In reviewing a final decision of the Commissioner, the Court's duty is to determine whether it is based upon correct legal standards and principles and whether it is supported by substantial evidence in the record, taken as a whole. *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (the Court "is limited to determining whether the [Social Security Administration's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard"). "'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (citations omitted). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the

record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

**B.  Eligibility Standard for Social Security Disability Benefits**

The Social Security Act ("the Act") provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify for Social Security disability benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999).

The Act's regulations prescribe a five-step process for the evaluation of disability claims.  First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).

If the claimant is not currently engaged in "substantial gainful activity," the Commissioner proceeds to the second step, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities."  If the impairment is not severe, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third step, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations (the "Listings").  If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

If the impairment does not meet or equal a listing in Appendix 1, the Commissioner proceeds to the fourth step, which is whether, despite the claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is used to assess whether he or she can perform one of the five categories of work recognized by SSA regulations: very heavy, heavy, medium, light and sedentary. 20 C.F.R. § 404.1567(a). Sedentary is the least rigorous of the five categories. *Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998) (citing 20 C.F.R. § 404.1567). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that s/he can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving her case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir. 2004).

## III.    DISCUSSION

Plaintiff and Defendant disagree on whether the Commissioner's decision denying Plaintiff's disability benefits from April 2010 to May 2013 is supported by substantial evidence. The Commissioner argues that the correct legal standards were applied and that the SSA's

decision must be affirmed. (Dkt. 17 ("Def. Br.") at ECF 3.)[17] Plaintiff argues that the ALJ erred by: (1) finding that Plaintiff did not meet one of the Listings; (2) not following the treating physician rule; (3) improperly assessing the credibility of Plaintiff's testimony about the intensity, persistence and limiting effects of his symptoms; and (4) presenting only one hypothetical question to the VE. (Dkt. 14 ("Pl. Br.") at ECF 12, 20, 25.) For the reasons set forth below, the Court remands this case for further consideration of the evidence under a correct application of law consistent with this opinion.

### A. The ALJ Failed to Follow the Treating Physician Rule

Plaintiff argues that the ALJ erred by not according due weight to the opinions of Plaintiff's treating professionals, Ms. Carr and Ms. Phillips, whom the ALJ did not find to be "acceptable treating sources." (Tr. 16.) The Court agrees, and finds that the ALJ erroneously failed to follow the treating physician rule.

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). A treating source is defined as a claimant's own "physician, psychologist, or other acceptable medical source who provides … medical treatment or evaluation and who has … ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.902. Acceptable medical sources include licensed physicians and psychologists. 20 C.F.R. § 416.913(a). If there is no qualified treating source in a case, the ALJ should "evaluate every medical opinion," regardless of whether it is from "acceptable medical sources" or "other sources," and consider factors including

---

[17] "ECF" refers to the page numbering of the court's electronic filing system, and not the document's internal pagination.

examining history, treating relationship, supportability, consistency, and specialization to decide the proper weight afforded to each opinion. 20 C.F.R. § 416.927(c); *see Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182-83 (E.D.N.Y. 2011) (the regulations require every medical opinion in the administrative record to be evaluated when determining whether a claimant is disabled); *see also Perillo v. Astrue*, 516 F. Supp. 2d 206, 208 (D. Conn. 2007) (the factors apply to opinions of acceptable medical sources as well as other sources). "Other sources" include other medical professionals, such as *nurse practitioners* and *social workers*, as well as non-medical sources, such as caregivers, parents, and siblings. 20 C.F.R. § 416.913(d) (emphasis added).

A treating physician's medical opinion will be given "controlling weight," if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence []." *Hernandez*, 814 F. Supp. 2d at 182 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Opinions of "other sources" are also "important and should be evaluated on key issues such as impairment severity and functional effects." *Id.* (citations omitted). Consideration of a medical opinion from "other sources" is "particularly important where that provider is the sole source that had a regular treatment relationship with plaintiff." *Thrasher v. Miller*, No. 12 CV 0880, 2015 WL 3463453, at *7 (W.D.N.Y. June 1, 2015) (internal quotation marks and citations omitted).

In this case, Plaintiff only had ongoing treatment relationships with Ms. Carr, a nurse practitioner, and Ms. Phillips, a licensed clinical social worker, both of whom qualify as "other sources" under SSA regulations. (Tr. 247-49, 260, 308-315, 326-334). Between July 15, 2010 and August 22, 2011, Plaintiff was treated and medicated by Ms. Carr on a regular basis. (Tr. 247-49, 260, 274, 309, 328.) By contrast, Dr. Meadow, although he is an acceptable medical source, conducted only one consultative psychiatric evaluation of Plaintiff, on August 13, 2010.

(Tr. 262.)  Similarly, Dr. Hou, although an acceptable medical source, only completed a single psychiatric review form for Plaintiff, on October 4, 2010, based solely on his review of Plaintiff's medical and mental records and without physically examining Plaintiff.  Because there was no treating physician or other qualified treating source in Plaintiff's case, the ALJ should have "evaluate[d] every medical opinion," including those from "other sources," and no single opinion should have been given controlling weight.  *See* 20 C.F.R. §§ 416.902, 416.927(c).

Here, the ALJ erroneously failed to accord due weight to every medical opinion in the record.  First, the ALJ did not give sufficient weight to the opinions of Ms. Carr, with whom Plaintiff had "an ongoing treating relationship".  *See Duell v. Astrue*, No. 08 CV 969, 2010 WL 87298, at *5 (N.D.N.Y. Jan. 5, 2010) (opinions of a nurse practitioner who regularly treats a claimant is entitled to "some extra consideration") (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)).  The ALJ also failed to discuss any of the listed factors pursuant to 20 C.F.R. § 416.927(c) in evaluating Ms. Carr's medical opinions.  In effect, the ALJ categorically discounted Ms. Carr's opinions as coming from a medical source that was "not acceptable".  (Tr. 16); *see Perillo,* 516 F. Supp. 2d at 208 (finding ALJ's statement that opinions of other sources are not entitled to greater weight than opinions of acceptable medical source an inadequate explanation for discounting the opinions of Plaintiff's treating psychoanalyst and therapist).  The ALJ's failure to accord greater weight to Ms. Carr's opinions is even more significant because she was one of only two professionals with whom Plaintiff had an "ongoing treating relationship".  *See Hernandez,* 814 F. Supp. 2d at 188 (finding ALJ's failure to consider plaintiff's "other source" evidence particularly critical where the sole treating professional with whom Plaintiff had "a regular treating relationship" was a social worker).

The ALJ also rejected Ms. Carr's opinions on the basis that "although the claimant's mental impairments are severe, Ms. Carr did not adequately take into account the claimant's level of functioning despite the impairments." (Tr. 16.) This approach, however, inappropriately introduces a claimant's level of functioning as part of the third inquiry, which is whether the claimant's impairments meet or equal in severity any of the Listings. A claimant's level of functioning is a factor to consider under the fourth inquiry, *i.e.*, whether, despite the claimant's severe impairment, he has the RFC to perform past relevant work, but not under the third inquiry. *See* 20 C.F.R. 404.1520(a)(4). Thus, the ALJ improperly considered Plaintiff's level of functioning in assessing the value of Ms. Carr's opinion regarding the severity of Plaintiff's impairments for purposes of the third inquiry.

Second, the ALJ failed to even consider or give any weight to Ms. Phillips's opinion. Nor did the ALJ explain why he failed to do so. Though Ms. Phillips is a social worker, she had an "ongoing treating relationship" with Plaintiff during the relevant time frame. Ms. Phillips treated and medicated Plaintiff from July 2010 to September 2010. (Tr. 271-72.) Given the absence of a treating physician in this case, Ms. Phillips's opinions, like those of Ms. Carr, should have been considered when determining the severity of Plaintiff's symptoms. *See Hernandez*, 814 F. Supp. 2d at 183 ("Reports from social workers who treated a plaintiff are particularly important, and thus may play a vital role in the determination of the effect of [a plaintiff's] impairment[s], if the social worker's opinion is the sole [treating] source that had a regular treatment relationship with the plaintiff.") (internal quotation marks and citations omitted). Though the ALJ has the discretion to discount a social worker's opinion, he or she must explain that decision, which the ALJ failed to do in this case. *See Canales v. Commissioner of Social Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010); *accord* SSR 06-03p, 2006 WL

2329939, at *2-3 (Soc. Sec. Admin. Aug. 9, 2006) ("[M]edical sources … such as … licensed clinical social workers [] have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources … are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."). Nowhere on the record did the ALJ discuss the merits of Ms. Phillips's opinions, which, notably, were consistent with Ms. Carr's opinions. Therefore, the ALJ erred by failing to weigh every medical opinion, as required by 20 C.F.R. § 416.927(c).

Third, the ALJ gave undue weight to the opinions of Dr. Meadow, a consultative physician. Opinions of a consultative physician should be afforded "little weight" because "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). In this case, Dr. Meadow only examined Plaintiff once, on August 13, 2010. This one-time examination of Plaintiff conveys only a snapshot of Plaintiff's symptoms on the day of the examination or, at most, for a brief period close to that time, in contrast to the reports of Plaintiff's other treating sources, whose opinions reflect Plaintiff's condition over the course of almost two years.

Fourth, the ALJ similarly accorded undue weight to the opinions of Dr. Hou, a non-examining source. The ALJ reasoned that Dr. Hou's opinions were given significant weight because "they are supported by the evidence of record as a whole, which provides a compelling indication of the claimant's ability to function despite his mental impairments." (Tr. 16.) However, under the treating physician rule, the opinions of non-examining sources should not be given significant weight. *Fernandez v. Astrue*, No. 11 CV 3896, 2013 WL 1291284 at *16

(E.D.N.Y. Mar. 28, 2013) (finding that an ALJ erred giving "significant weight to two non-examining sources and little weight to every examining source, including the treating physicians"); *Roman*, 2012 WL 4566128, at *16 ("The medical opinion of a non-examining medical expert . . . may not be accorded significant weight."). Accordingly, the Court finds that the ALJ erred by failing to follow the treating physician rule and by failing to properly evaluate every medical opinion.

**B.     The ALJ's Finding that Plaintiff Did Not Meet the Listing of § 12.03 is not Supported by Substantial Evidence**

Plaintiff argues that the ALJ also erred in finding that Plaintiff did not meet a listed impairment when, in fact, his condition met the Listings set forth in § 12.03(A) and (B) and § 12.04(A) and (B).

Evaluation of mental impairments follows a "special technique" pursuant to 20 C.F.R. § 404.1520. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) ("Th[e] regulations require application of a 'special technique' at the second and third steps of the five-step framework [] and at each level of administrative review.") (internal citations omitted). This technique requires "the reviewing authority to determine first whether [a] claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Hernandez*, 814 F. Supp. 2d at 180-81 (E.D.N.Y. 2011) (internal quotation marks and citations omitted); *see* 20 C.F.R. § 404.1520a(b), (c). "[I]f the degree of limitation in each of the first three areas is rated mild or better, and no episodes of decompensation are identified . . .[,] the

reviewing authority . . . will conclude that the claimant's mental impairment is not severe and will deny benefits." *Kohler*, 546 F.3d at 266.

If the ALJ determines that the claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the ALJ "must first compare the relevant medical findings [along with] the functional limitation rating to the criteria of listed mental disorders." *Id.* (quoting 20 C.F.R. § 404.1520a(d)(2)). If an impairment or combination of impairments meets or medically equals the severity of one of the listed mental disorders, "the claimant will be found disabled." *Id.* If not, the reviewing authority will then assess the claimant's RFC. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)). The application of this technique shall be documented in the decision "at the initial and reconsideration levels of the administrative review process." *Id.* (citing 20 C.F.R. § 404.1520a(e)).

In this case, because the ALJ found that Plaintiff had the severe impairments of panic disorder with agoraphobia, and schizoaffective disorder, the determinative issue was whether Plaintiff's mental health impairments met the § 12.03 and § 12.04 Listings. The ALJ found that Plaintiff's impairments did not meet or medically equal the severity of one of the Listings. (Tr. 12-13.) Plaintiff contends that this finding was erroneous and that his conditions satisfy the requirements of § 12.03(A) and (B) (Schizophrenic, paranoid and other psychotic disorders) and the requirements of § 12.04(A) and (B) (Affective disorders).

The ALJ's decision was based on its finding that Plaintiff's impairments satisfied the § 12.03(A) requirements, but not those of paragraph (B). Paragraphs (B) of § 12.03 and § 12.04 are identical, and require a "marked limitation" in at least two of the following: (1) activities of daily living, (2) maintaining social function, (3) maintaining concentration, persistence or pace,

or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.03(B); § 12.04(B).

The ALJ discussed each of these requirements in his decision.  With respect to the first requirement, the ALJ noted that Plaintiff had mild restriction in activities of daily living because "he independently handle[d] his own personal care, utilize[d] public transportation, and travel[led] alone." (Tr. 13.)  With respect to the second requirement, the ALJ found that Plaintiff was only "moderately limited" in his social functioning, based on "the claimant's testimony . . . that he utilized public transportation." (*Id*.)  The ALJ further argued that this assessment of Plaintiff's social functioning was justified by Plaintiff's status as a full-time college student and his past relevant work as a teacher's assistant and dental assistant.  (*Id*.)  As to the third requirement, the ALJ found that Plaintiff had only "moderate difficulties in concentration, persistence or pace," because Plaintiff "maintained the concentration, persistence and pace to perform the jobs of teacher's assistant and dental assistant." (*Id*.)  Lastly, with respect to the fourth requirement, the ALJ found that Plaintiff had experienced one to two episodes of decompensation, each of extended duration.  (*Id*.)

The ALJ, however, incorporated improper factors into this analysis.  First, a claimant's mere ability to use public transportation is not a factor that should be considered in determining a claimant's limitations in social functioning.  *McGregor v. Astrue*, 993 F. Supp. 2d 130, 138 (N.D.N.Y. 2012) ("Social functioning refers to the claimant's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  It includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.") (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2)) (internal quotation marks omitted)).  Second, Plaintiff's prior work as a dental assistant and a teaching assistant was

performed from 2004 to 2006 and from 2006 to 2010, respectively, which was prior to April 2010, Plaintiff's alleged onset date of mental impairments. (Tr. 51-52, 175.) The ALJ failed to explain why prior work experience would prove that Plaintiff could still maintain the same level of concentration, persistence or pace in the later period of claimed disability.

Further, the ALJ's analysis is not supported by substantial evidence in accordance with the SSA's regulations. It failed to incorporate any medical evidence on the record in finding that Plaintiff did not meet or medically equal the severity of a listing. *See* 20 C.F.R. § 404.1520a(e)(4) ("The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)."); *see also Benjamin v. Astrue*, No. 11 CV 2074, 2013 WL 271505, at *5 (E.D.N.Y. Jan. 23, 2013); *Jenkins v. Comm. of Social Sec.*, 769 F. Supp. 2d 157, 161 (W.D.N.Y. 2011). For example, on August 13, 2010, Dr. Meadow reported in a psychiatric evaluation that Plaintiff "socializes infrequently with friends as well as with immediate family." (Tr. 264.) On April 14, 2011, the director of disability services at Plaintiff's school communicated with Ms. Carr regarding concerns expressed by a professor about Plaintiff's behavior/affect and feeling threatened. (Tr. 310.) Ms. Carr noted that when she saw Plaintiff on May 5, 2011, he needed occasional encouragement to offer spontaneous conversation. (Tr. 312.) On July 15, 2011, Ms. Carr again noted that Plaintiff had to be encouraged into independent conversation. (Tr. 314.) Ms. Carr and Ms. Phillips both opined that Plaintiff had severe limitations in responding appropriately to co-workers. (Tr. 339.) They also found Plaintiff had "marked difficulties" in maintaining social functioning. (Tr. 341, 344.) The ALJ failed to explain why he did not consider or credit these findings in reaching the conclusion that Plaintiff was only moderately restricted in his social functioning. On August 13,

2010, Dr. Meadow noted that Plaintiff "was recently hospitalized for a psychiatric illness," and that "[h]e should have several months outside of the hospital in a stabilized condition before he attempts to reenter the workforce." (Tr. 264.) On November 4, 2011, Ms. Carr and Ms. Phillips opined that Plaintiff had moderately severe limitations in responding appropriate to supervision and performing complex and repetitive tasks, and had severe limitations in responding to customary work pressure, and performing varied tasks. (Tr. 339-40.) They further found that Plaintiff had difficulty concentrating or thinking, and had "marked deficiencies of concentration, persistence or pace", resulting in frequent failure to complete tasks in a timely manner. (Tr. 341, 343-44.) The ALJ again failed to explain why he did not consider or credit these findings in evaluating Plaintiff's difficulties in concentration, persistence or pace.

While the Court can choose not to remand if the ALJ's error is harmless, here, the errors were not harmless. *See Benjamin*, 2013 WL 271505 at *6 (citing *Kohler*, 546 F.3d at 269). The ALJ failed to consider substantial evidence in the record that was critical to the fourth inquiry, *i.e.*, whether Plaintiff's impairments met or equaled one of the Listings. *See Fait v. Astrue*, No. 10 CV 5407, 2012 WL 2449939, at *7 (E.D.N.Y. June 27, 2012) (remanding the case to the SSA for proper application of the special technique and finding that Plaintiff's testimony, his uncle's testimony, a psychiatrist's report, and a medical expert's analysis were all potentially relevant to the determination of Plaintiff's functional limitations in activities of daily life, social functioning, and concentration, persistence, or pace). Because it is unclear whether the ALJ would have reached the same conclusion had he analyzed all of the medical evidence on the record, this case must be remanded.

### C. The ALJ's Assessment of Plaintiff's Credibility is Not Supported by Substantial Evidence

Plaintiff contends that the ALJ erroneously evaluated the credibility of Plaintiff's testimony with respect to the intensity, persistence and limiting effects of his symptoms. The Court agrees.

In assessing whether a claimant is disabled, the ALJ may consider the claimant's allegations of pain and functional limitations; however, the ALJ retains the discretion to assess the claimant's credibility. *See Fernandez*, 2013 WL 1291284, at *18 (citing *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010)); *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010)). The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from "a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." 20 C.F.R. § 404.1529(b). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms [to] determine" the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18.

Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence on the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii). "If the ALJ rejects plaintiff's testimony after

considering the objective medial evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Fernandez*, 2013 WL 1291284, at *18 (citing *Correale-Englehart*, 687 F. Supp. 2d at 435).

In this case, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 15.) The ALJ reasoned that Plaintiff's credibility "is compromised, in part by his conflicting reports regarding substance abuse, work history and his current college studies." (*Id*.) The ALJ also found that Plaintiff's allegations were not credible because he was a full-time college student and "he is functional to the extent that he has performed past relevant work requiring constant contact with students and patients." (*Id*.)

The ALJ's credibility determination is not supported by substantial evidence. The ALJ did not explicitly state which factor listed in 20 C.F.R. § 404.1529(c)(3) he considered in making this credibility determination. He only implicitly discussed one factor, *i.e.*, the claimant's daily activities. The ALJ reasoned that Plaintiff's daily activities were not constrained because he was functional "to the extent that he has performed past relevant work requiring constant contact with students and patients" and that he was a full-time college student. (Tr. 15.) This explanation, however, is inadequate. First, as discussed above, the ALJ did not explain how Plaintiff's work experience prior to the onset of his claimed disabling condition proved that he maintained the same level of mental capacity after the onset date. Second, the ALJ failed to consider any of the other factors identified in 20 C.F.R. § 404.1529(c)(3)(i)-(vii). *See Grosse v. Comm'r of Soc.*

*Sec.,* No. 08–CV–4137, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding that the ALJ committed legal error in wholly failing to consider factors (ii) to (vii)). Nor did the ALJ "indicate[s] how [he] balanced the various factors." *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (citing *Simone v. Astrue,* No. 08 CV 4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009)).

Second, the ALJ erred in finding Plaintiff's testimony not credible because it was inconsistent with Plaintiff's RFC assessment. (Tr. 15.) An ALJ is required to evaluate a claimant's credibility *before* assessing his or her RFC. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1529(a)-(b), 404.1512(b)(3), and S.S.R. 96–7p). Failure to do so is frequently found to warrant remand. *See*, *e.g.*, *Henningsen v. Comm'r of Soc. Sec. Admin.*, No. 13 CV 4392, 2015 WL 3604912, at *15 (E.D.N.Y. June 8, 2015) (finding that "assessing a plaintiff's credibility after making an RFC determination warrants remand, as the SSA regulations provide that the ALJ must assess the claimant's credibility before evaluating the RFC.") (internal quotation marks and citations omitted); *Yu v. Astrue,* 963 F. Supp. 2d 201, 217 (E.D.N.Y. 2013) (remanding where ALJ employed the same "to the extent ... inconsistent" formulation used here); *Smollins v. Astrue,* 2011 WL 3857123, at *10 (E.D.N.Y. Sept. 1, 2011) (same)). Accordingly, the ALJ's negative assessment of Plaintiff's credibility based on purported inconsistencies between Plaintiff's testimony and his RFC assessment warrants the remand of this case.

### D. The ALJ Failed to Present an Adequate Hypothetical Question to the VE

Plaintiff also argues that the ALJ erred by presenting only one hypothetical question to the VE. While the Court does not find the presentation of a single hypothetical to the VE, in itself, erroneous, it finds that the hypothetical presented to the VE was incomplete and thus constituted error.

An ALJ may rely on a vocational expert's testimony regarding a hypothetical if the facts of the hypothetical are based on substantial evidence and "accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (internal quotation marks and citations omitted). An ALJ's hypothetical question should explicitly incorporate any limitations in concentration, persistence, and pace. *McIntyre v. Miller*, 758 F.3d 146, 152 (2d Cir. 2014) ("[T]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995))). However, "an ALJ's failure to incorporate non-exertional limitations in a hypothetical …. is harmless error if (1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited "to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]" *Id.* (internal quotation marks and citations omitted).

In this case, the hypothetical presented by the ALJ was "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (Tr. 17.) The ALJ found that "the claimant ha[d] the residual functional capacity to perform a full range of work at all exertional levels", but was limited to work "involving simple, routine, repetitive tasks in a static environment, and requiring only brief and superficial contact with the public." (Tr. 14.)

However, because, as discussed above, the ALJ's RFC findings are not supported by substantial evidence and did not incorporate the non-exertional limitations found by Plaintiff's

treating sources, the hypothetical question presented by the ALJ failed to "accurately reflect the limitations and capabilities of the claimant involved." *Calabrese,* 358 F. App'x at 276. Accordingly, the VE's assessment of Plaintiff's ability to perform work existing in the national economy must be re-determined on remand, based on an accurate and complete RFC assessment.

## E. The Matter is Remanded for Further Proceedings Consistent with this Opinion

"'When there are gaps in the administrative record or the ALJ has applied an improper legal standard,' a court should remand the case to the Commissioner for the further development of the record." *Speruggia v. Astrue,* No. 05 CV 3532, 2008 WL 818004, at *14 (E.D.N.Y. Mar.26, 2008) (quoting *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980)).

In this case, the ALJ improperly weighed the available medical opinions and failed to adequately explain why he accorded little or no weight to the opinions of Plaintiff's treating professionals, Ms. Carr and Ms. Phillips, while giving significant weight to Dr. Meadow, a consulting psychiatrist, and Dr. Hou, a non-examining psychiatrist. *See Hernandez,* 814 F. Supp. 2d at 188-89 (finding that the ALJ failed to explain the weight afforded to Plaintiff's medical evidence and remanding the case for further proceedings consistent with the opinion). The ALJ also failed to adequately analyze medical evidence in finding that Plaintiff did not meet any of the Listings. *Kohler*, 547 F.3d at 268-69 (finding that the ALJ failed to apply the "special technique" in evaluating plaintiff's impairments and remanding the case to the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with the Circuit's opinion). Further, the ALJ failed to analyze the factors set forth in the regulations when evaluating Plaintiff's credibility and in presenting the hypothetical question to the VE. The Court cannot conclude that these errors were harmless, nor can it determine whether a proper consideration of the available medical evidence would have altered the ALJ's conclusion.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED and the Commissioner's motion is DENIED.  Pursuant to 42 U.S.C. § 405(g), the case is remanded to the Commissioner for further proceedings consistent with this opinion.


                                        SO ORDERED.


                                        */s/ Pamela K. Chen*
                                        Pamela K. Chen
                                        United States District Judge

Dated:  August 18, 2015
        Brooklyn, New York